**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

——————————————————————————— )
BEVERIDGE & DIAMOND, P.C.,          )
                                    )
          Plaintiff,                )
                                    )
     v.                             )  Civ. Action No. 14-80 (EGS)
                                    )
UNITED STATES DEPARTMENT OF         )
HEALTH AND HUMAN SERVICES,          )
*et al.*,                           )
                                    )
          Defendants.               )
——————————————————————————— )

<u>**MEMORANDUM OPINION**</u>

     Plaintiff Beveridge & Diamond, P.C. ("Beveridge") requested information from defendants, the United States Department of Health and Human Services ("HHS"), Centers for Disease Control and Prevention ("CDC") and the Agency for Toxic Substances and Disease Registry ("ATSDR") (collectively, the "defendants"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. In response to Beveridge's FOIA request, the defendants released some records to Beveridge but claimed that two sets of data were not in its possession, and thus not an "agency record" under FOIA.  Beveridge challenges the defendants' claim that it does not possess the data.

     In support of its argument, Beveridge **_relies heavily_** on the record developed in a related case before this Court – *Beveridge & Diamond, P.C. v. United States Environmental Protection*

*Agency*, 14-cv-631, 2015 WL 251592 (D.D.C. Jan. 20, 2015).   In
that case, involving the same plaintiff and substantially
similar claims, this Court held that the Environmental
Protection Agency ("EPA") did not create or obtain the data at
issue in this case; therefore, the data was not an "agency
record" under FOIA.  *Beveridge & Diamond, P.C. v. United States
Environmental Protection Agency*, No. 14-cv-631, 2015 WL 251592
at *4 (D.D.C Jan. 20, 2015).  Beveridge did not appeal this
Court's decision in *Beveridge & Diamond, P.C. v. United States
Environmental Protection Agency.*

Pending before the Court are the parties' cross-motions for
summary judgment.  Upon consideration of the motions, the
responses and replies thereto, the applicable law, and the
entire record, the Court **GRANTS** the defendants' motion and
**DENIES** Beveridge's cross-motion.

I.    **BACKGROUND**

Because the factual record in this case is virtually
identical to the related case *Beveridge & Diamond, P.C. v.
United States Environmental Protection Agency*, and Beveridge
places considerable reliance on those facts, the Court recites
the background facts as found in that case.  In addition, the
Court supplements the factual record, when necessary, based on
the pleadings in this case.

### A. Libby Amphibole Asbestos

2

In 1881, gold miners discovered vermiculite in Libby, Montana. *Beveridge & Diamond, P.C.,* 2015 WL 251592 at *1. Vermiculite is a silver-gold to gray-brown mineral that is flat and shiny in its natural state. *Id*. Between 1923 and the early 1990s, a mine near Libby produced millions of tons of vermiculite ore. *Id.* While in operation, the Libby mine may have produced more than 70 percent of the world's supply of vermiculite. *Id.* Vermiculite has been used in building insulation and as a soil conditioner. *Id.* The vermiculite from the Libby mine, however, was contaminated with a toxic form of naturally-occurring asbestos called tremolite-actinolite asbestiform mineral fibers, also known as Libby amphibole asbestos. *Id.*

Libby amphibole asbestos is a distinct and relatively uncommon form of asbestos. *Id.* It is not a commercially viable mineral, but is instead a contaminant in the vermiculite ore from the Libby mine. *Id.* Hundreds of former mine workers and Libby residents have been diagnosed with asbestos related disease. *Id.* Many individuals have died from illness caused by asbestos exposure. *Id.*

### B. Toxicological Review

The EPA initiated an emergency response action in November 1999 to address questions and concerns raised by citizens of

Libby regarding possible ongoing exposures to asbestos fibers as a result of historical mining, processing, and exportation of asbestos-containing vermiculite. *Id.* As part of its response, the EPA engaged in a number of efforts, including cleanup and related risk management activities in Libby. *Id.* To support future cleanup efforts and risk related activities, the EPA is in the process of conducting a Toxicological Review of Libby amphibole asbestos ("Toxicological Review" or "Toxicological Assessment"), which will, among other things, summarize "the potential adverse health effects of Libby amphibole asbestos exposure." *Id.* The EPA released its draft Toxicological Assessment for external review and comment in August 2011. *Id.*

The draft Toxicological Assessment reviews the potential hazards, both cancer and noncancer health effects, from exposure to Libby amphibole asbestos and provides quantitative information for use in risk assessments. *Id.* Occupational epidemiology studies for two worksites where workers were exposed to Libby amphibole asbestos forms the basis of the draft Toxicological Review. *Id.* These worksites include the mine and mill near Libby, Montana, and the vermiculite processing plant in Marysville, Ohio, which produced lawn care products using vermiculite. *Id.* The cohort of workers that were exposed to Libby amphibole asbestos at the plant in Marysville, Ohio, ("Marysville, Ohio Cohort") has served as the basis of earlier

4

published, peer-reviewed scientific studies, which the EPA relies on in its draft Toxicological Review.  *Id.*

The final Toxicological Review will be included on the EPA's Integrated Risk Information System ("IRIS") database and will be used to support the EPA's cleanup and related risk management activities at the Libby site.  *Id.* at *2.  The EPA's IRIS is a "human health assessment program that evaluates information on health effects that may result from exposure to environmental contaminants."  *Id.*  IRIS is used to support the EPA's regulatory activities.  *Id.*  The EPA is in the process of finalizing its Toxicological Review.  *Id.*

### C. University of Cincinnati

There have been additional efforts — parallel to, and at times related to, the EPA's Toxicological Review — by federal agencies to study the adverse health effects of Libby amphibole asbestos.  Specifically, federal agencies have entered into the following agreements with the University of Cincinnati ("UC"):

**United States Department of Transportation ("DOT").**  The DOT Volpe Center contracted with UC to update data on the Marysville, Ohio Cohort ("Volpe Contract").  *Id.*  The Volpe Contract assigned seven tasks to be performed in two phases. *Id.*  The first phase involved scientific assessment of the ways in which workers were exposed to asbestos and how much asbestos

they were exposed to.  *Id.*  The second phase studied how being exposed to asbestos affected the workers' health.

**HHS.**  In 2009, CDC/ATSDR posted a Funding Opportunity Announcement ("FOA") seeking to "support investigator initiated research that will expand and advance our understanding of exposures to the Libby amphibole and the resulting health outcomes.  The priority area of this research is to further conduct epidemiologic investigation of the Marysville, Ohio Cohort, using newly obtained worker exposure data and more comprehensive medical testing.  The results of the research conducted under this announcement will add to the body of scientific knowledge about the natural history of health outcomes associated with exposure to Libby amphibole."  *See* Defs.' Reply, ECF No. 18 at 3; Declaration of Bruno Viana, ECF No. 18-1 at ¶ 5 ("Viana Decl.").  Among other things, the FOA anticipated that the grantee would use "an existing dataset, identify, locate, and recruit members of the cohort of Marysville, Ohio workers exposed to the Libby amphibole."  Viana Decl. ¶ 5.  The grantee would then "[p]erform follow-up medical screening of the Marysville, Ohio Cohort using chest x-rays, spirometry, a symptom questionnaire, and other medical testing as appropriate, including, but not limited to high-resolution computed tomography of the chest and other pulmonary function

tests, such as diffusion capacity and lung volume measurements."
*Id.*

The UC was awarded the grant and conducted its research in
2009-2011 ("ATSDR Grant").  *See* Viana Decl. ¶ 6.  The FOA
required potential grantees to submit a data sharing plan that
described "how the final research data will be shared or explain
why data sharing is not possible."  *Id.* ¶ 9.  UC's grant
application included a resource sharing plan stating that
"[a]fter completion of the study and any related publications,
researchers will make available exposure data and human health
data without personal identifiers to government agencies as
requested."  *Id.* ¶ 10.  This was incorporated by reference into
the ATSDR Grant.  *Id.*  To date, UC has "at least one anticipated
publication using the data collected under the [ATSDR Grant]."
Defs.' Reply, ECF No. 18 at 5; *see also* Viana Decl. ¶ 16.  The
UC study will be "submitted for publication in the near future
and will then go through the peer-review process."  Defs.'
Reply, ECF No. 18 at 5; *see also* Viana Decl. ¶ 16.

### D. Procedural History

Beveridge is a professional corporation incorporated in
Washington, D.C. with its principal place of business in
Washington, D.C.  *See* Compl., ECF No. 1 ¶ 7.  In June 2013,
Beveridge filed a FOIA request with the defendants for data and
documents "related to follow-up work and updates to a

Marysville, Ohio Cohort that was the subject of previous
scientific studies." *Id*. ¶¶ 1-2.  Specifically, Beveridge
requested, among other information, high resolution computed
tomography ("HRCT") data and pulmonary function testing ("PFT")
data; Beveridge alleged that both sets of data "supplement and
update data that have been used as a primary basis for the non-
cancer portion of a Toxicological Assessment that is being
conducted by" the EPA.  *See* Bev.'s Mot., ECF No. 14 at 2.

     During the course of this lawsuit, and in response to
Beveridge's FOIA request, the defendants produced over three
hundred pages of responsive records.  *See* Declaration of
Katherine S. Norris, ECF No. 13-3 ¶¶ 19-21 ("Norris Decl.").
The defendants, however, redacted in part several pages of
records under FOIA Exemptions for deliberative process and
personal privacy.  *Id.; see also* 5 U.S.C. §§ 552(b)(5)-(6).
Further, the defendants claimed that it did not possess any
records concerning PFT data and HRCT data.  *See* Viana Decl. ¶¶
12-17.

     On April 21, 2014, the defendants filed the pending motion
for summary judgment.  *See* Defs.' Mot., ECF No. 13.  In the
motion, the defendants argued that they had conducted an
adequate search and that all responsive documents were produced
or properly redacted under FOIA Exemptions 5 and 6.  *Id.* at 1-2.
Further, the defendants asserted that the PFT data and HRCT data

8

are not "agency records" under FOIA. *See* Defs.' Reply, ECF No. 18 at 1-3. Specifically, the defendants argued that Beveridge's constructive control argument is wholly without merit because the defendants were not involved in the collection of data, do not have a right to access such data, have not obtained the data, have not reviewed the data and have not relied on the data or resulting studies in the development of CDC/ATSDR policy. *See* Viana Decl. ¶¶ 12-17. Thus, the defendants did not have constructive control over the PFT and HRCT data. *Id.*

On May 12, 2014, Beveridge filed its combined opposition and cross-motion for summary judgment. In its motion, Beveridge asserted that the defendants violated FOIA by failing to provide the HRCT and PFT data. *See* Bev's Mot., ECF No. 14 at 3. Specifically, Beveridge argued that the PFT and HRCT data are "agency records" over which the defendants have constructive control. *Id.* In support of its argument, Beveridge asserted that the PFT and HRCT data "were collected by the [UC] at the direction of and pursuant to contracts with federal agencies for federal use, including ATSDR's efforts to generate data regarding the potential health effects of Libby amphibole asbestos pursuant to its statutory obligations under CERCLA § 104(i)(1)(E) & (i)(5)(A), 42 U.S.C. § 9604(i)(1)(E) & (i)(5)(A)." *Id.*

On May 29, 2014, the defendants filed their combined reply in support of its motion for summary judgment and opposition to Beveridge's cross-motion.  *See* Defs.' Reply, ECF No. 17.  On June 6, 2014, Beveridge filed its reply.  *See* Bev's Reply, ECF No. 19.  The motions are now ripe for determination by the Court.

## II.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of fact exists, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 658 F. Supp. 2d 217, 224 (D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

10

Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate. *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011) (citations omitted).

In considering a motion for summary judgment under FOIA, the court must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). The court may award summary judgment solely on the basis of information provided by the department or agency in affidavits or declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). Agency affidavits or declarations must be "relatively detailed and non-conclusory." *SafeCard Servs. v.*

*Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)
(quotation marks omitted).  Such affidavits or declarations are
accorded "a presumption of good faith, which cannot be rebutted
by purely speculative claims about the existence and
discoverability of other documents."  *Id.* (quotation marks
omitted).

### III. ANALYSIS

As a preliminary matter, Beveridge expressly does not
challenge the defendants' withholdings and redactions under FOIA
Exemptions 5 and 6.  *See* Bev's Mot. ECF No 14 at 2 ("In order to
limit the issues before the Court and focus on the most
important responsive materials, Plaintiff has determined not to
challenge CDC/ATSDR's redactions and withholding.").  The Court
therefore treats as conceded the defendants' motion for summary
judgment with respect to FOIA Exemptions 5 and 6.  *See, e.g.,*
*Jewett v. U.S. Dep't of State*, No. 11-cv-1852, 2013 WL 550077,
at *9 (D.D.C. Feb. 14, 2013) (treating as conceded defendants'
reliance on FOIA exemption where plaintiff "offers no
rebuttal").  The only remaining issue that the Court has to
resolve is whether the PFT and HRCT data are "agency records"
under FOIA.

The FOIA applies to "agency records."  *See* 5 U.S.C. §
552(a)(4)(B).  As both the Supreme Court and the D.C. Circuit
have repeatedly noted, while FOIA "limited access to 'agency

12

records,'" it "did not provide any definition of 'agency records.'"  *See Forsham v. Harris,* 445 U.S. 169, 178 (1980); *see also U.S. Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 142, (1989); *Tax Analysts v. U.S. Dep't of Justice,* 845 F.2d 1060, 1067 (D.C. Cir. 1988), *aff'd,* 492 U.S. 136 (1989); *McGehee v. CIA,* 697 F.2d 1095, 1106 (D.C. Cir. 1983).  In *Tax Analysts*, the Supreme Court held that the term "agency records" extends only to those documents that an agency both (1) "create[s] or obtain [s]," **and** (2) "control[s] ... at the time the FOIA request [was] made."  *See Tax Analysts*, 492 U.S. at 144-45; *see also Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996).  Therefore, to qualify as an "agency record" subject to FOIA disclosure rules, the defendants must have either created or obtained the data, *and* have been in control of the data at the time the FOIA request was made.

Because the Court finds that the defendants did not create or obtain the data or have a legal duty under the FOIA to seek to obtain records of the data, the PFT and HRCT data are not "agency records" under FOIA.  Even assuming, *arguendo*, that the Court found that the defendants created or obtained the data, the defendants did not, under the *Burka* factors, control the data at the time the FOIA request was made.

### A. The Defendants Did Not Create or Obtain the Data.

The record is clear that the defendants did not create or obtain the data from UC.  The defendants provided two detailed declarations, one from Katherine Norris, FOIA Officer for the CDC and ATSDR, who confirmed that the defendants do not possess or control the data.  *See* Norris Decl. ¶ 16.  The other declarant, Bruno Viana, Deputy FOIA Officer for CDC and ATSDR, stated that the defendants never had the study data in their possession, had no involvement in the collection of the data, had no involvement in developing "the study design for the research conducted under the [ATSDR Grant]," have not asked "for the data and has no plans to obtain the data in the future," and "ha[ve] not relied on the data or resulting studies in the development of any CDC/ATSDR policy."  *See* Viana Decl. ¶¶ 12-17.[1]

Beveridge argues that the defendants have constructive control of the PFT and HRCT data.  *See* Bev's Mot., ECF No. 14 at

---

[1] Beveridge rejects both declarations, claiming that the declarants lack personal knowledge relevant to the HRCT and PFT data.  *See e.g.*, Bev's Reply, ECF No. 19 at 9.  Beveridge's allegations misunderstand the personal knowledge requirements for FOIA declarations.  The knowledge requirement of Federal Rule of Civil Procedure 56(c) can be satisfied, in FOIA cases, via the declaration of an agency official knowledgeable in the way information is gathered.  *See SafeCard Servs.,* 926 F.2d at 1201; *Meeropol v. Meese,* 790 F.2d 942, 951 (D.C. Cir. 1986) (approving reliance upon affidavit of agency employee responsible for supervising search, although he necessarily relied upon information provided by staff members who actually performed search).  Reliance upon an affidavit of an employee supervising a FOIA search is appropriate, even when the employee relied on information provided by those who actually performed the search.  *SafeCard Servs.*, 926 F.2d at 1201.

3.   Beveridge bases much of its constructive control argument on
the purported fact CDC/ASTDR has a right of access to the
research data.  Specifically, Beveridge asserts that Dr. Vikas
Kapil, a Medical Officer at the National Center for
Environmental Health within the CDC, "surely has access to the
underlying data and could have received it on request."  *Id.* at
18.  Beverdige's entire argument, however, is based on pure
speculation, unsupported by the factual record in this case.

    Dr. Kapil, among other things, served as a co-author and
edited a draft manuscript written by UC.  *See* Defs.' Reply, ECF
No. 18 at 8.  The record is clear that Dr. Kapil never had
access to the PFT and HRCT data.  Viana Decl. ¶ 8.  In addition,
the defendants – in response to Beveridge's FOIA request –
processed the documents Dr. Kapil reviewed, and Beveridge has
not challenged the defendants' response, including the
defendants' withholdings and redactions under FOIA Exemptions 5
and 6. *See* Bev's Mot. ECF No 14 at 2   Specifically, the draft
manuscript was processed and withheld by the defendants under
FOIA Exemption 5, which Beveridge does not challenge; thus, as
previously determined, the Court treats as conceded the
defendants' motion for summary judgment with respect to FOIA
Exemption 5.  *Id.*  Further, to date, the draft manuscript has
not been published.  *See* Viana Decl. ¶¶ 10, 17.  Until the draft

15

manuscript is accepted for publication and published, CDC/ATSDR
does not have a right of access to the data.  *Id.*

In sum, Beveridge's unsupported assertion that Dr. Kapil has
access to the data or can request such data is wholly
insufficient to overcome the record in this case or the
testimony of Ms. Norris and Mr. Viana.  *See SafeCard Servs.,* 926
F.2d at 1200 ("Agency affidavits are accorded a presumption of
good faith, which cannot be rebutted by 'purely speculative
claims about the existence and discoverability of other
documents.'") (quoting *Ground Saucer Watch, Inc. v. CIA,* 692
F.2d 770, 771 (D.C. Cir. 1981)).

Even assuming that the defendants had a right to acquire the
PFT and HRCT data, which it does not, see Viana Decl. ¶¶ 10, 17,
**the defendants have not exercised that right**.  *See Judicial
Watch v. Fed. Hous. Fin. Agency*, 646 F.3d 924, 928 (D.C. Cir.
2011)("Although there is no doubt that the FHFA could consult
the requested records as it conducts its business, the problem
for Judicial Watch is that no one from the FHFA has done so.
The Supreme Court held in *Forsham v. Harris* that documents an
agency had the right to acquire would not become agency records
subject to FOIA 'unless and until the right is exercised.'").
The FOIA applies to "records which have been in fact obtained,
and not records which merely could have been obtained."  *See
Forsham,* 445 U.S. at 185-86.  By ordering the defendants to

16

"exercise [their] right of access" the Court would be effectively compelling the defendants to create an agency record.  *Id.*  The "FOIA imposes no duty on the agency to create records."  *Id.*  Simply put, to accept Beveridge's argument would turn the structure and purpose of the FOIA on its head.  *See Beveridge & Diamond, P.C.*, 2015 WL 251592 at *5.  "The public cannot learn anything about agency decisionmaking from a document . . . neither created nor consulted" by the defendants. *See Judicial Watch,* 646 F.3d at 927.

Moreover, Beveridge's reliance on *Burka* to support its constructive control argument is misplaced.  The D.C. Circuit found in *Burka* that the agency created the data at issue because the agency exercised "extensive supervision and control . . . over [the] collection and analysis of the data."  *See Burka,* 87 F.3d at 515.  Beverdige has proffered no evidence showing that the defendants exercised "extensive supervision and control" over the collection of the PFT and HRCT data by UC.  The facts of this case are easily distinguishable from *Burka*:  the defendants did not exercise extensive supervision and control over the collection of PFT and HRCT data by UC.  Ms. Norris confirmed in her declaration that the defendants do not possess or control the data.  *See* Norris Decl. ¶ 16.  Further, Mr. Viana stated in his declaration that the defendants never had the study data in their possession, had no involvement in the

17

collection of the data, had no involvement in developing "the study design for the research conducted under the [ATSDR Grant]," have not asked "for the data and has no plans to obtain the data in the future," and "ha[ve] not relied on the data or resulting studies in the development of any CDC/ATSDR policy." *See* Viana Decl. ¶¶ 12-17.

Rather than introduce countervailing facts, Beveridge argues that the defendants had constructive control over the data because the data, under the Volpe Contract and ATSDR Grant, were generated for federal government purposes, and were to be provided to and used by the EPA in its Toxicological Assessment.[2] *See* Bev's Reply, ECF No. 19 at 1-2.  The Court finds this argument unpersuasive.  The law is settled that the mere fact — without extensive supervision and control by the defendants — UC "received federal funds to finance the research [is not] sufficient to conclude the data were created or obtained by the agency."  *See Burka,* 87 F.3d at 515.  The defendants cannot require UC to provide them with the data UC may have collected under the Volpe Contract, nor do the defendants have a right to

---

[2] Beveridge spent considerable effort in this case attempting to convince this Court that the EPA, which is not a party in this case, obtained the data at issue.  *See e.g.,* Bev's Reply, ECF No. 19 at 4.  The Court – in a related case in which the EPA was a party – rejected the identical arguments Beveridge makes in this case concerning the EPA.  *Beveridge & Diamond, P.C.,* 2015 WL 251592.

access UC's data under the ATSDR Grant until the draft
manuscript is accepted for publication and published.  *See* Viana
Decl. ¶¶ 10, 17.  To date, the draft manuscript has not been
published.  *See id.*

Accordingly, because the Court finds that the defendants
did not create or obtain the data, the PFT and HRCT data are not
"agency records" under FOIA.

**B. The Defendants Did Not Control the Data.**

Even assuming, *arguendo*, that the Court found that the
defendants created or obtained the data, the defendants did not,
under the *Burka* factors, control the data at the time the FOIA
request was made.  Control means that "the materials have come
into the agency's possession in the legitimate conduct of its
official duties," see *Tax Analysts,* 492 U.S. at 144-45, and is
determined with regard to the four factors outlined by the D.C.
Circuit in *Burka.  See Burka,* 87 F.3d at 515.  Those factors
include:  (1) the intent of the document's creator to retain or
relinquish control over the records; (2) the ability of the
agency to use and dispose of the record as it sees fit; (3) the
extent to which agency personnel have read or relied upon the
document; and (4) the degree to which the document was
integrated into the agency's record system or files.  *Id.*
However, the third factor — "use [of the record] — is the

decisive factor" in deciding whether the agency controls a record under FOIA.  *Judicial Watch,* 646 F.3d at 928.

Although the D.C. Circuit has recently questioned whether the *Burka* test is helpful in delineating whether the agency controlled the requested material, especially since past application of the test "reveal[ed] its considerable indeterminacy," see *Cause of Action v. Nat. Archives and Records Admin.,* 753 F.3d 210, 214-15 (D.C. Cir. 2014), the Court finds applying the test in this case particularly easy.  All four *Burka* factors unambiguously favor the defendants.

First, UC intends to retain control of the data until it completes all studies using the data and any related publications, which, to date, has not yet occurred.  *See* Viana Decl. ¶¶ 10, 17.  Second, the defendants do not have the ability to use and dispose of the data as they see fit because the defendants do not have access to such data and do not have the ability, under the ATSDR Grant or Volpe Contract, to require UC to provide them with the data until the draft manuscript is accepted for publication and published.  *Id.* ¶¶ 10, 17.  Third, the defendants' employees have not read or relied on the data; an agency cannot rely on data it has never viewed.  *Id.* ¶¶ 12-17.  In deciding whether an agency controls a document its employees created, the D.C. Circuit has consistently found that "use is the decisive factor."  *See Judicial Watch Inc.,* 646 F.3d

at 927.  The Court is of the opinion that use is decisive here. "[W]here an agency has neither created nor referenced a document in the conduct of its official duties, the agency has not exercised the degree of control required to subject the document to disclosure under FOIA." *Id.* at 928.  This factor is fatal to Beveridge's claim.  *Id.* at 927.  Finally, "it goes without saying that an agency cannot integrate into its record system a document created by a third party that none of its employees have read." *Id.* at 928.  Ms. Norris and Mr. Viana have attested to the fact that the defendants have never seen the data Beveridge seeks.  *See e.g.*, Viana Decl. ¶¶ 12-17; Norris Decl. ¶ 16.  Therefore, the defendants did not control the data at the time the FOIA request was made.

**\*\*\*\*\***

For the reasons stated above, the Court concludes that the PFT and HRCT data are not "agency records" under FOIA.

IV. **CONCLUSION**

For the forgoing reasons, the Court hereby **GRANTS** the defendants' motion for summary judgment and **DENIES** Beveridge's cross-motion for summary judgment.  An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:   **Emmet G. Sullivan**
          **United States District Judge**
          **March 30, 2015**

21